**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL CASE NO. 3:20-cv-00563-RJC
[CRIMINAL CASE NO. 3:16-cr-00307-RJC-DCK-1]**

| | | |
|---|---|---|
| **JAMIE BLUNDER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **O R D E R** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

 **THIS MATTER** is before the Court on Petitioner's Motion under 28 U.S.C. § 2255 to

Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, [CV Doc. 1],[1] and on the

evidentiary hearing held on March 21, 2022, [3/21/2022 Docket Entry].  Petitioner is represented

by counsel.

**I. BACKGROUND**

 **A. Offense Conduct and Investigation**

 By 2002, Petitioner Jamie Blunder ("Petitioner") was buying and selling powder and crack

cocaine in multiple regions in North Carolina.  [CR Doc. 288 at 298-99: Trial Tr.; CR Doc. 289 at

55-56: Trial Tr.; see CR Doc. 289 at 121-23].  Sometime between 2000 and 2002, Petitioner began

selling personal use quantities of cocaine to Irvin Lampley and later Lampley sold cocaine and

crack cocaine for Petitioner.  [CR Doc. 289 at 55-58, 62].  In 2008, Petitioner met David Pate, who

---

[1] Citations to the record herein contain the relevant document number referenced preceded by either the
letters "CV," denoting that the document is listed on the docket in the civil case file number 3:20-cv-00563-
RJC, or the letters "CR," denoting that the document is listed on the docket in the criminal case file number
3:16-cr-00307-RJC-DCK-1.

began supplying Petitioner with two ounces of cocaine every two weeks. [CR Doc. 288 at 111; CR Doc. 289 at 121]. Before long, Pate was supplying Petitioner with two kilograms of cocaine a month. [CR Doc. 289 at 122-23, 136]. Petitioner also conspired with Aaron Dixon to traffic cocaine. Beginning in 2012, Petitioner started selling Dixon two ounces of crack cocaine at a time, which increased to 9 to 18 ounces once or twice a month. [CR Doc. 288 at 291, 296-97, 315, 322]. In 2013, Dixon started buying a kilogram of powder cocaine from Petitioner every month. [Id. at 298-300, 314, 320]. Dixon cooked the cocaine into crack and sold it to his customers. [Id. at 298].

From 2013 until his arrest, Petitioner worked as a federal officer with the Transportation Safety Agency (TSA) at Charlotte-Douglas International Airport. [CR Doc. 272 at ¶ 2: Presentence Investigation Report (PSR)]. In 2016, law enforcement began investigating Petitioner after receiving information that he was distributing drugs. [Id. at ¶ 6]. During surveillance, investigators observed what appeared to be hand-to-hand narcotics transactions between Petitioner and others. [See e.g., CR Doc. 288 at 41-42, 160-61, 309-10; CR Doc. 200: Govt's Reply to Motion to Suppress]. Investigators also observed that Petitioner had a routine in which he made regular stops at Pate's house and then a townhome Petitioner had rented for Alafia Fowlkes. Petitioner also made stops at other locations where investigators suspected he was engaged in hand-to-hand transactions and stops at a PNC bank where he made numerous cash deposits. [See Doc. 288 at 41-45, 176-78, 181-82, 191-92, 307-08, 312; CR Doc. 289 at 127, 163; CR Doc. 200].

On July 26, 2016, Petitioner traveled to Pate's house in High Point, North Carolina, and then to Fowlkes' in nearby Jamestown, where he stayed for over an hour. [CR Doc. 272 at ¶ 9]. Petitioner carried a blue plastic grocery bag as he walked out of Fowlkes' home and drove to "a variety of areas," making short stops until he stopped at Jake's Diner in Greensboro. [Id.]. After eating lunch there with another man, Petitioner discarded the blue plastic grocery bag in a dumpster

behind the restaurant. [Id.]. A member of the surveillance team retrieved the bag, which contained cocaine residue, plastic packaging consistent with packaging kilogram quantities of cocaine, and fabric softener sheets. [Id. at ¶ 10; Doc. 288 at 46-47, 163; CR Doc. 289 at 167-68].

On October 3, 2016, Petitioner met Pate at a Biscuitville restaurant in High Point, North Carolina, where Petitioner and Pate made an exchange. [CR Doc. 288 at 52]. Petitioner took a package he received from Pate to Fowlkes' townhome where he stayed for an hour. [CR Doc. 272 at ¶ 9]. Petitioner left Fowlkes' home carrying a plastic Walmart bag that "appeared to be full and tied at the top." [CR Doc. 288 at 52-53; CR Doc. 200-2 at ¶ 142: "Wiretap Aff. I"]. Petitioner threw the bag into a construction dumpster behind a Shell gas station in Salisbury, North Carolina. [CR Doc. 288 at 53, 123, 235-37; CR Doc. 200-2 at ¶ 143]. Investigators seized the bag and found cocaine residue and packaging consistent with a kilogram quantity of cocaine. [CR Doc. 289 at 54, 56, 59, 123, 240-41; Doc. 289 at 109; CR Doc. 200-2 at ¶¶ 144-46].

During the 2016 investigation of the drug trafficking operation, investigators obtained two wiretap orders. In September 2016, the United States applied to the Court for an order under 18 U.S.C. § 2516, authorizing investigators to intercept communications to and from a cell phone Petitioner used to communicate with other targets of the investigation ("Telephone 1"). [CR Doc. 200-1: "Wiretap Aff. I"]. A month later, the United States sought an extension of that wiretap order to intercept communications to and from a second cell phone that investigators had learned Petitioner was using to conduct his drug trafficking business ("Telephone 2"). [CR Doc. 200-2]. Using historical cell site information, investigators learned that Telephone 1 and Telephone 2 were in close proximity, using the same cell phone tower or towers located close to each other, at nearly the same time. [Id. at ¶¶ 175-88].

### B.     Criminal Prosecution

On November 8, 2016, Petitioner, along with eight co-conspirators, was charged in a sealed Criminal Complaint and a warrant issued for his arrest. [CR Doc. 3: Criminal Complaint; CR Doc. 4: Arrest Warrant]. On November 9, 2016, Petitioner was driving his car in High Point, North Carolina. Clifford White, who identified himself as a Trooper with the North Carolina Highway Patrol, stopped Petitioner. [See CR Doc. 288 at 99, 146]. White told Petitioner that he was investigating a road rage incident, but later admitted that this was a ruse. [CR Doc. 167 at 3: Govt's Resp. to Motion to Suppress]. White instructed Petitioner to step out of the vehicle and handcuffed him. [Id. at 2]. While Petitioner was in handcuffs and before he was Mirandized, officers questioned him. Officers searched Petitioner and his car. During the search, officers seized an iPhone, a silver Patron box containing 251 grams of cocaine, a ledger, and Petitioner's TSA credentials. [CR Doc. 288 at 99, 101, 105-06; CR Doc. 189 at 170].

Law enforcement agents searched Fowlke's townhome and found a large safe with two drawers that were locked and required both a combination and a key to open. [CR Doc. 288 at 135; CR Doc. 289 at 14]. Inside the safe officers found 331 grams of crack cocaine, 97 grams of powder cocaine, plastic baggies, a digital scale with a spoon, and a loaded .38 caliber revolver. [CR Doc. 289 at 17-18, 20, 24, 110-12]. Agents also searched a PNC Bank safe deposit box belonging to Petitioner, finding five or six appraisals for jewelry Petitioner owned and the combination for the safe discovered at Fowlkes' townhome. [CR Doc. 288 at 254]. Agents searched Petitioner's home and found more than $7,200 in cash in the master bedroom along with more than a dozen watches and other jewelry. [CR Doc. 289 at 39-43].

On November 18, 2016, a grand jury indicted Petitioner on one count of cocaine trafficking conspiracy – from October 2013 to November 2016 – in violation of 21 U.S.C. §§ 841(a)(1) and

846, alleging that five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine was reasonably foreseeable to Petitioner, implicating 21 U.S.C. § 841(b)(1)(A), (Count One) and on one count of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two).  [CR Doc. 61: Bill of Indictment].  Petitioner originally retained Allen Brotherton to represent him.  [11/21/2016 Docket Entry].  Represented by Brotherton at his arraignment, Petitioner pleaded not guilty.  [11/28/2016 Docket Entry].  On February 2, 2017, Yolanda Trotman filed an appearance in the case, replacing Brotherton.  [CR Doc. 101; see 2/2/2017 Docket Entry].

On February 22, 2017, with Trotman as Petitioner's counsel, the United States made a formal plea offer to Petitioner.  [CV Doc. 2-1; see CV Doc. 5 at 6].  Under the terms of this plea agreement, Petitioner would have pleaded guilty to Count One and the Government would have dismissed the § 924(c) charge.  [Id. at 5].  The proposed plea agreement provided that the minimum term of imprisonment on Count One was 10 years and the maximum term was life.  [Id. at 6]. Under the proposed plea agreement, the parties would jointly recommend, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), a drug quantity between 50 and 150 kilograms of cocaine. [Id.].  Significantly, the agreement required Petitioner to provide substantial assistance to the Government by providing information regarding his charges, criminal activity of his co-Defendants, and any other criminal activity known to Petitioner, as well as testimony at trial against his co-Defendants.  [Id. at ¶ 25].  In other words, the Plea Agreement required Petitioner to cooperate.  Petitioner rejected this formal plea offer.

On April 20, 2017, Petitioner was charged in a Superseding Bill of Indictment.  [CR Doc. 139].  The Superseding Bill expanded the dates of the conspiracy to from 2002 to November 2016; alleged that the conspiracy involved cocaine and crack cocaine, or cocaine base; alleged that five

kilograms or more of cocaine and 280 grams or more of cocaine base were reasonably foreseeable to Petitioner, implicating 21 U.S.C. §841(b)(1)(A); and retained the § 924(c) charge. [CR Doc. 139 at 1-2]. On April 27, 2017, Petitioner pleaded not guilty to the Superseding Bill. [4/27/17 Docket Entry].

Petitioner alleges that the Government made a second plea offer at some point and that the second offer again involved a plea to Count One and dismissal of Count Two.[2] [CV Doc. 2-1 at ¶ 6]. Petitioner also rejected this second plea offer, opting again to proceed to trial.[3] Petitioner moved to suppress all wire and oral communications obtained through the wiretap orders. [CR Doc. 193]. He argued that investigators had not shown that traditional investigative procedures were insufficient to expose his crime and that the orders were not supported by probable cause to believe that Petitioner was associated with Telephone 2. [Id.]. Petitioner also moved to suppress evidence from the stop, including the cocaine found in Petitioner's car, and statements made by Petitioner before he was Mirandized. [CR Docs. 158, 159, 165]. Without mentioning the arrest warrant, Petitioner, through Trotman, argued that the stop violated the Fourth Amendment because officers had not observed him commit a traffic or criminal offense. [CR Doc. 165]. Petitioner also argued that he was cooperative during the traffic stop, that officers had no reason to believe that he was armed and dangerous, that the pat down search was not warranted, and that officers searched his car without clear consent. [Id.]. Petitioner also asserted that he was improperly questioned after he was handcuffed but before being Mirandized. [Id.]. In response, the United States agreed not to use any of Petitioner's statements from the traffic stop at trial. [CR Doc. 167].

---

[2] The Government seems to acknowledge that a second plea was offered [See CV Doc. 5 at 10], but it is not in the record before the Court and neither party presents its terms.

[3] Of note, Petitioner also demanded that the jury decide the forfeiture claim and determine whether the named property was the proceeds of or involved or used in Petitioner's crimes. [See CR Docs. 139, 212].

There was no hearing on Petitioner's motions to suppress and, immediately before trial, the Court denied them. [CR Doc. 288 at 7]. The Court held there was probable cause to stop and arrest Petitioner based on the valid arrest warrant. [Id. at 16, 17]. The Court also found there was probable cause to believe there was contraband in the car based on surveillance of Petitioner having just met the person alleged to have been his drug source. [Id.].

At trial, Petitioner argued that the United States was going to ask the jury to make a jump from short-term surveillance to Petitioner's participation in a 14-year conspiracy involving multiple kilograms of cocaine and 280 grams of cocaine base. [CR Doc. 288 at 34-35]. Petitioner argued that it was implausible that he could have hidden drug activity for so many years and that the firearm found was tied to a major drug trafficking conspiracy. [Id. at 35-36]. Petitioner noted that the United States would not be presenting evidence from undercover agents, informants, controlled buys, or search warrants. [Id.]. Instead, Petitioner argued that the Government was relying on a handful of calls to create a 14-year conspiracy. [Id.].

The jury heard testimony from several law enforcement witnesses and from Pate, Dixon, Fowlkes, and Lampley. [CR Doc. 289 at 55-58, 62]. Petitioner did not testify. The jury found Petitioner guilty on both counts and determined that at least five kilograms of cocaine and 280 grams of cocaine base were reasonably foreseeable to Petitioner based on his participation in the conspiracy. [CR Doc. 211]. On the forfeiture claim, the jury found that the named property was connected to Petitioner's crimes. [CR Doc. 212].

Before sentencing, a probation officer prepared a PSR. [CR Doc. 272]. The probation officer recommended a base offense level of 36 based on a drug quantity of 214 kilograms, which represented two kilograms of cocaine monthly from 2008 until Petitioner's arrest in November 2016. [Id. at ¶ 81 (citing U.S.S.G. §2D1.1(a)(5))]. The probation officer also recommended a

7

two-level enhancement for maintaining a drug house, U.S.S.G. §2D1.1(b)(12), and a four-level enhancement for Petitioner's leadership role in the conspiracy, U.S.S.G. §3B1.1(a), for a total offense level (TOL) of 42. [Id. at ¶¶ 82, 84, 89]. With a criminal history category of I, the guidelines advised a range of imprisonment of 360 months to life for Count One, followed by the mandatory statutory sentence of five years under § 924(c) for Count Two. [Id. at ¶¶ 123-25]. Petitioner filed numerous objections to the PSR, including to the amount of cocaine and crack cocaine included as relevant conduct, the enhancement for maintaining a drug house, and the leadership enhancement. [See Doc. 272 at 28-31].

At sentencing, Petitioner argued his objections and for a downward variance, noting that this was not a violent crime and that there was no evidence he had used the firearm during any drug transactions. [CR Doc. 320 at 3-18, 28-37: Sentencing Tr.]. Although the Court found Pate's testimony credible, the Court granted Petitioner's objection in part and applied a base offense level of 34 for a drug quantity of 50 to 150 kilograms. [Id. at 25]. The Court was concerned with the length of the conspiracy and whether the estimates of drug quantity were somewhat . [Id.]. The Court also granted in part Petitioner's objection to the four-level role in the offense enhancement and instead assigned a three-level enhancement. [Id. at 27]. With these adjustments, Petitioner's TOL was 39, which yielded a guidelines range of 262 to 327 months' imprisonment plus five years for the firearm offense. [Id.]. Trotman noted that, in going to trial, "Mr. Blunder made a choice to exercise his constitutional right to trial to raise various issues that he felt were important." [Id. at 33]. Petitioner chose not to address the Court. [Id. at 37]. In considering the § 3553(a) factors, the Court varied downward two levels due to the impact of the § 924(c) conviction on Petitioner's sentence. [Id. at 45]. The Court sentenced Petitioner to a term of 240 months in prison for the conspiracy offense and a consecutive term of 60 months for the firearm offense. [Id. at 46].

Petitioner appealed his conviction and sentence. He argued that this Court erred in denying his motion to suppress the wiretap evidence from his cell phones, that the district court should have excluded the testimony of the Government's expert witness about the methods and coded language used by cocaine traffickers, and that the evidence at trial was insufficient to support the § 924(c) conviction. United States v. Blunder, 795 Fed. App'x 180, 181 (4th Cir. 2019). The Fourth Circuit affirmed. Id. at 183. Notably, Petitioner did not appeal the denial of the motion to suppress evidence from the stop.

On October 9, 2020, Petitioner filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. [CV Doc. 1]. Petitioner argues that he received ineffective assistance of counsel because "she provided deficient legal advice that resulted in [Petitioner's] rejection of plea offers and a more severe sentence that he would have received had he accepted those offers rather than go to trial." [Id.]. Specifically, Plaintiff contends that:

> Counsel inadequately advised Mr. Blunder of the evidence that could be used against him if he went to trial, erroneously advised him of what the government would need to show to meet its burden of proof, erroneously and inadequately advised him of the law as it related to a motion to suppress evidence seized during a traffic stop, and inadequately advised him of his sentencing exposure.

[CV Doc. 1 at 4].

In support of his motion, Petitioner submitted his own Affidavit, in which he attests the following. [CV Doc. 2-1 at 1-4]. Trotman informed him of two plea offers that were made to Petitioner on different occasions. [Id. at ¶ 6]. Petitioner does "not recall understanding differences between the two offers with regard to how the sentencing guidelines would apply if [he] were to accept either of the offers." [Id.]. Trotman advised Petitioner that the Government "had a weak case" against him. [Id. at ¶ 7]. Trotman told Petitioner that the Government had no "directs hits" against him, which Petitioner took to mean there were no controlled buys from Petitioner or hand-

to-hand transactions, and, without direct hits, it would be difficult for the Government to obtain a conviction.  [Id.].

Trotman also advised that Petitioner's defense was strong due to a "strong suppression issue."  [Id.].  Trotman told Petitioner there were grounds to suppress the evidence from the November 9, 2016 traffic stop that immediately preceded Petitioner's arrest.  [Id. at ¶ 8].  Trotman gave Petitioner a copy of the motion and told him that it would "cut the government off at the knees."  [Id.].  Trotman did not advise Petitioner the impact the outstanding arrest warrant would have on the suppression motion.  Trotman explained that there would be an evidentiary hearing to address the motion to suppress and that, "if it were granted," the Government may dismiss the case.  Based on Trotman's advice and on Petitioner's own reading of the motion to suppress, he believed the stop and search were unconstitutional and the motion would be granted.

Trotman told Petitioner that he was recorded on wiretapped phone calls, but Trotman never played the calls for Petitioner or discussed the content of those calls with him.  [Id. at ¶ 8].  Trotman filed a motion to suppress the recordings of the wiretapped phone conversations and provided Petitioner a copy of the motion, telling him it was very "technical."  [Id. at ¶ 9].  Trotman told Petitioner that the Government would have a difficult time convicting Petitioner of the firearm charge because Petitioner's name was not on the lease of the house where the firearm was found, none of Petitioner's personal belongings were there, and there was no fingerprint or DNA evidence against Petitioner.  [Id. at ¶ 8].

Petitioner attests that his decision to go to trial, rather than accept a plea offer, was based on Trotman's advice regarding the weakness of the Government's case and the strength of Petitioner's defense, which included Trotman's advice regarding the stop and search suppression motion.  [Id. at ¶ 7].  Specifically, Petitioner attests that if he had known that the stop and search

were constitutional, he "probably would have decided not to go to trial and would have accepted a plea offer made to [him]." [CV Doc. 2-1 at ¶ 8]. Petitioner further attests that if he had been "more thoroughly advised" of the evidence against him and how it would be used against him and "had certain items of evidence been presented to [him]," he "would have accepted one of the plea offers made to [him] and entered a guilty plea rather than go to trial." [Id. at ¶ 7].

Finally, Petitioner claims that Trotman did not "fully advise [him] on the minimum and maximum penalties [he] was facing, nor did she advise [him] on how the United States Sentencing Guidelines would apply." [Id. at ¶ 11]. Specifically, she did not advise Petitioner of the different sentences he could be exposed to if he were to lose at trial versus if he pleaded guilty. [Id.]. In sum, Petitioner attests as follows:

> Had I been advised of the sentence I was facing if I were to lose at trial, along with being more accurately advised of the potential success, or lack thereof, of the motions to suppress and more thoroughly advised of the evidence against me, I probably would have accepted one of the plea offers made to me and entered a guilty plea rather than go to trial.

[Id.]. Petitioner asks the Court to order the Government to reoffer the plea agreement, allow Petitioner to accept it, vacate the judgment and sentence, and hold a hearing to resentence Petitioner consistent with the plea agreement. [CV Doc. 1 at 12]. The Government timely responded [CV Doc. 5] and Petitioner replied [CV Doc. 6]. After reviewing the record, the Court determined that an evidentiary hearing was necessary to resolve the matters before Court, see United States v. Witherspoon, 231 F.3d 923, 926-27 (4th Cir. 2000), and ordered the parties to appear.

## II.    EVIDENTIARY HEARING

The stop and search suppression issue predominated the evidentiary hearing.[4]  Petitioner testified largely in keeping with his Affidavit.  At the hearing, Petitioner emphasized that Trotman told him that the Government had "a weak case," that the evidence of drugs seized from his car was "very significant," that the seized drugs were "the main body of evidence" against him, that Trotman told him "it was going to go away," and that the motion to suppress was "critical" to his defense.  Petitioner testified that there would have been no need to go to trial if the stop and search were justified by an arrest warrant and that he obviously would have served less time if he had taken the plea.

Petitioner claimed that Trotman did not review the plea agreement with him and, instead, told him to "flush it down the toilet" if he decided not to sign it.  Petitioner testified that, when Trotman brought him the plea agreement, she also had Pate's and Lampley's debriefing statements and told Petitioner "they really [weren't] that bad."  Although claiming to have not reviewed the plea agreement, Petitioner admitted that he reviewed these statements and commented in writing on their substance for Trotman.

Petitioner testified that Trotman told him that cooperating was not a good option and that he did not believe he had much to contribute, in any event.  Petitioner claimed that Trotman never showed him transcripts of the wiretap calls, never asked him to decode the calls, and that he never heard the recordings.  Petitioner claimed Trotman never explained the sentencing guidelines to him, that she did not tell him the difference in potential sentences between accepting a plea and going to trial, and that he never really knew he was facing a life sentence.

---

[4] Petitioner conceded at the hearing that he would not be pursuing the other claims of ineffective assistance.

Petitioner testified that Trotman told him that § 924(c) charge would not stick because his name was not on Fowlkes' lease, his fingerprints and DNA were not on the gun, and Petitioner's personal belongings were not found and Fowlkes' home. Petitioner claimed that Trotman went so far as to say that, under these facts, he "[couldn't] be charged with that by law."

Petitioner was questioned about a set of notes he wrote to Trotman regarding and reflecting his decision to reject the plea agreement. In these notes, Petitioner wrote that "5 to 10 years for 'Hearsay,' illegal wiretaps, an illegal arrest and numerous cons. Amendment violations, phantom contraband and plastic bags w/ no prints" "doesn't make good common sense." He stated, "I will not give my life away for this!" and decides that he is "Going w/ option 2" to "fight case w/ Ms. T!" [CV Doc. 12: Gov't Hearing Ex. 14]. Petitioner also provided Trotman with notes detailing what he knew about everyone involved in or with knowledge of the conspiracy. [Id.: Gov't Hearing Ex. 15]. In these notes, he also provided facts he found relevant about himself: no criminal history, college, stable work history, no drug use, father, former husband, "engaged?," "light drinker (twice a month)," "no evidence (direct/circum.)," and "no ledger found to match Pates." [Id.].

The evidence at the hearing also included an October 16, 2017 letter by Petitioner to Trotman – after his conviction but before he was sentenced – in which Petitioner asked Trotman to represent him in a civil suit for wrongful conviction and police misconduct. [Id.: Gov't Hearing Ex. 17]. In this letter, Petitioner wrote, "you are a[n] excellent attorney that has an eye for detail and takes a true general interest in the well being of the client." He continued, "You have integrity and I TRUST YOU" and thanked her "for truly fighting for me." [Id. (emphases in original)]. After Petitioner lost his direct appeal, he wrote Trotman asking her for an affidavit of ineffective assistance of counsel that Petitioner claims Trotman offered to write immediately after he lost the

trial. Petitioner testified that he did not understand the comment at that time, but after he lost his direct appeal, he started to explore "the next step" and began considering an ineffective assistance of counsel claim. Trotman testified that she was "astounded" by Petitioner's request for such an affidavit "because he literally made up a conversation that never happened." Trotman immediately responded to this letter, advising Petitioner that she never offered to write an ineffective assistance affidavit and that she would not do so. Then, about a week later, Trotman received an email from Petitioner's sister on his behalf in which Petitioner asked Trotman to represent him if he were successful on a Section 2255 motion to vacate in which he planned to argue structural error for the Court's failure to hold an evidentiary hearing on Petitioner's motions to suppress.

Not having been directly addressed through Petitioner's testimony, the Court asked Petitioner's counsel how Petitioner could have had such a high opinion of Trotman if she had "blown the one thing that [Petitioner] needed to know to accept the plea back in February." Petitioner's counsel offered that Petitioner likely did not understand the significance of the arrest warrant to the suppression issue until sometime during or after the direct appeal. Counsel, however, appeared to be speculating and offered nothing concrete on which to base this assumption.

At the hearing, Trotman testified about her first meeting with Petitioner in January 2017. At this meeting, Trotman did not yet have a copy of the Criminal Complaint. Petitioner told her the charges he was facing and the potential sentence of a minimum of 35 years to life, the drug weight charged, that he was listed first in the conspiracy but claimed he should not have been, why he was seeking new counsel, and that he wanted someone to fight for him. Trotman further testified that at a meeting with Petitioner in very early February, he told her, "I don't want any

stone unturned. Whatever issues we have, whatever suppression issues we have, any constitutional issues, we need to raise them all."

Trotman participated in a reverse proffer with the Government at which the Government provided slides outlining Petitioner's potential sentences with cooperation and a plea versus going to trial. [CV Doc. 12: Gov't Hearing Ex. 8]. The Government forecasted a sentence of seven years with the plea agreement, which included cooperation, and a sentence of 35 years to life if Petitioner proceeded to trial. [Id.]. In late February 2017, Trotman received the plea agreement from the Government. She brought the plea agreement to Petitioner and they discussed it in detail, including the drug weight, the 5K for substantial assistance, the 10-year minimum and maximum life sentence for Count One, the appeal waiver, and the guidelines sentence. They discussed his sentence both with and without the plea agreement, particularly the consecutive sentence on the gun charge.[5] Trotman advised the Petitioner to give the plea agreement a lot of thought and that it was ultimately his decision. She never told Petitioner to flush it down the toilet. At some point in March 2017, Trotman showed Petitioner the Government's slides regarding his potential sentences.

Trotman testified that Petitioner "was never interested in cooperating" and consistently, repeatedly voiced his desire for someone to fight for him. Trotman testified that "he was very specific that he wanted to go to trial." Petitioner had serious concerns about his daughter if he were to cooperate, particularly about her mother's ability to care for her. He disagreed with his placement at the top of the conspiracy and maintained he did not have much information on Pate. Petitioner also took great issue with the drug weight, and generally did not want to be a snitch.

_____

[5] Trotman's testimony suggests that she errantly believed that the firearm charge carried a mandatory 10-year, not 5-year, consecutive sentence.

15

Trotman testified that they also discussed the validity of the gun charge, including that Petitioner could be found guilty based on constructive possession. Trotman testified that Petitioner had issues with the gun charge because the gun was found in a safe in a common area of Fowlkes' townhome and Petitioner's prints and DNA were not found on the gun. Trotman testified that she would never have told Petitioner that he would be acquitted on that charge and that she did not tell Petitioner that it would be dismissed, only that "we could do our best to get to the reasonable doubt stage."

Trotman testified regarding the Superseding Indictment, which lowered the drug amount, considerably expanded the length of the conspiracy, and dropped several co-conspirators. She stated that Petitioner became even more resolved to go to trial after the Superseding Indictment because the drug amount had been reduced and he believed that there was no way the Government could prove his involvement in the conspiracy as far back as 2002.

Trotman testified that she went through the transcripts of the wiretap evidence with Petitioner and that he helped decode language used in the drug sales. She also testified that she showed Petitioner surveillance and other photographs and that Petitioner explained what was depicted in the photographs, including those of Pate's street and the townhome where the safe was found. Trotman discussed potential suppression issues regarding the wiretaps and wiretap affidavits with Petitioner.

Trotman, however, readily admitted that Petitioner told her there was no warrant for his arrest when he was stopped and searched on November 9, 2016, and that, in her "overzealousness," she failed to confirm this. The motion to suppress the stop and search, therefore, was premised on there being no warrant. And, as such, her advice to Petitioner on the likely success of this motion to suppress relied on there being no warrant. Trotman, however, testified that she never promised

16

Petitioner success on that motion and never told him that "it would cut the Government off at its knees." She further testified that it was one of several issues important to Petitioner, which also included his desire not to cooperate, the drug weight, the wiretap evidence, and potential challenges to proof of constructive possession of the firearm. In short, Trotman testified that Petitioner's decision to go to trial was not contingent on the suppression issue.

## III.    STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. "[W]hen a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claims," an evidentiary hearing is necessary. United States v. Mayhew, 995 F.3d 171, 176-77 (4th Cir. 2021) (citing United States v. Witherspoon, 231 F.3d 923, 926-27 (4th Cir. 2000)).

## IV.    DISCUSSION

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See

17

Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).

To establish prejudice, the petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. It is not sufficient to show the mere "'possibility of prejudice.'" Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1994) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

"The Sixth Amendment right to effective assistance of counsel 'extends to the plea-bargaining process.'" Mayhew, 995 F.3d at 177 (quoting Lafler v. Cooper, 566 U.S. 156, 162, 132 S.Ct. 1376 (2021)). Effective assistance of counsel at the plea-bargaining stage requires that defense counsel "communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Missouri v. Frye, 566 U.S. 134, 145, 132 S.Ct. 1399, 1408 (2012). This duty certainly applies where a plea offer is formal and with a fixed expiration date. Id. Moreover, "it is the responsibility of defense counsel to inform a defendant of the advantages and disadvantages of a plea agreement and the attendant statutory and

18

constitutional rights that a guilty plea would forego." <u>Libretti v. United States</u>, 516 U.S. 29, 50-51, 116 S.Ct. 356, 368 (1995). Counsel, however, is not ineffective for failing to obtain a plea offer that a defendant is willing to accept. <u>See</u> <u>Weatherford v. Bursey</u>, 429 U.S. 545, 561 (1977) (recognizing "there is no constitutional right to plea bargain").

"To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance," a petitioner must "show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." <u>Frye</u>, 566 U.S. at 147, 132 S. Ct. at 1409. Namely, a petitioner must "show the outcome of the plea process would have been different with competent advice." <u>Lafler</u>, 566 U.S. at 163. "[A] defendant establishes prejudice by showing that but for the ineffective assistance of counsel, there is a 'reasonable probability' that he would have accepted a plea, that the court would have approved its terms, and that the resulting conviction or sentence 'would have been less severe' than that actually imposed." <u>United States v. Mayhew</u>, 995 F.3d 171, 177 (4th Cir. 2021) (quoting <u>Lafler</u>, 566 U.S. 156 at 164). The petitioner "bears the burden of affirmatively proving prejudice." <u>Bowie v. Branker</u>, 512 F.3d 112, 120 (4th Cir. 2008). Courts, however, "should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." <u>Lee v. United States</u>, 137 S. Ct. 1958, 1967 (2017). Rather, the court should look to contemporaneous evidence of his desire to pursue a particular course of action. <u>Id.</u>

If a defendant shows that he rejected a plea offer because of his attorney's ineffective assistance, was found guilty at trial, and received a harsher sentence on those charges, "the court may exercise discretion in determining whether the defendant should receive the term of

imprisonment the government offered in the plea, the sentence he received at trial, or something in between." Strickland, 466 U.S. at 171.

For the sake of its determination here, the Court finds that Trotman's failure to determine whether there was a valid arrest warrant at the time of the stop and search was deficient counsel. The Court's determination of Plaintiff's ineffective assistance claim, therefore, turns on the prejudice, if any, flowing from Trotman's advice regarding the likelihood of success of the suppression motion, which of course was premised on there being no arrest warrant. Given the basic conflicts in testimony of Petitioner and Trotman, this determination is largely informed by their respective credibility, especially as corroborated (or not) by contemporaneous evidence of Petitioner's state of mind.

In short, Petitioner's testimony, particularly when viewed as a whole, is not credible. He wants the Court to believe that he was a passive defendant generally uninformed about his case, that he never really knew he was facing a life sentence or the difference in the potential sentences he faced with a plea versus an unsuccessful trial, and that he believed, when deciding whether to plead or go to trial, that his case lived or died with the motion to suppress the cocaine evidence.

The Court finds that the record belies these contentions. From the beginning, Petitioner took a very active role in his case. He hired Allen Brotherton to represent him. After a couple of months and what Petitioner deemed an unsuccessful detention hearing, Petitioner felt that Brotherton was not fighting for him effectively and that he was being forced into a plea. Petitioner then sought to hire Trotman. At their initial meeting, Petitioner told Trotman "exactly what he was facing" in terms of charges and sentences. Petitioner wrote Trotman several letters and provided her with extensive notes regarding each co-conspirator. Petitioner reviewed his co-coconspirators debriefing statements, marking them up with corrections and details for Trotman.

Petitioner outlined all the reasons why he chose to go to trial rather than take a plea. Petitioner reviewed transcripts of the wiretap calls with Trotman and helped her to decode language used in the drug sales.

Petitioner wants the Court to believe that Trotman did not review the plea agreement with him and that she told him to flush it down the toilet if he decided not to sign it. When asked about his reservations about cooperating pursuant to the plea agreement, Petitioner downplayed his concerns and up played his willingness to cooperate. The credible and contemporaneous evidence, however, shows that Petitioner was not interested in or willing to cooperate as required by the plea agreement. Moreover, there is no evidence showing that the Government was willing to offer a different plea agreement that was acceptable to Petitioner.

Petitioner's asserted role in his defense and knowledge of the details of the prosecution and proceedings, including potential sentences, which substantially conflict with credible evidence before the Court, bear directly on his credibility. Petitioner has demonstrated a willingness to skew or misrepresent the truth on several aspects of Trotman's representation. Petitioner cannot, in turn, expect the Court to believe him on the one point key to the ineffective assistance claim he maintains now. The Court finds it strangely curious that, on one hand, Petitioner claims to have believed that the motion to suppress was the most critical aspect of his defense before trial but failed to appreciate the significance of the loss of that motion until losing his direct appeal.

While the Court believes that the suppression motion was certainly a factor in the calculus of Petitioner's decision to plead or proceed to trial, it was very clearly not the only factor, as Petitioner now wants the Court to accept. In fact, the credible evidence shows that Petitioner never seriously considered pleading guilty in any event. Petitioner hired Trotman because he wanted

someone to fight for him.[6]  Petitioner never showed any willingness or desire to cooperate with the Government, which was required by the only written plea agreement before the Court.  Rather, the evidence showed that Petitioner repeatedly and consistently expressed that he would not cooperate.

These considerations lead the Court to find that Petitioner has not shown a reasonable probability that he would have pleaded guilty absent Trotman's deficiency.  While it is possible that Petitioner would have changed his mind and desired to plead guilty had he understood that the evidence of the stop and search was admissible, the evidence does not show a reasonable probability that he would have done so, especially pursuant to a plea agreement requiring substantial assistance.  There is also no evidence that the Government was willing to offer a plea that did not require such assistance.  After hearing Trotman's more credible testimony as supported by the contemporaneous evidence of Petitioner's state of mind, the Court cannot revisit the result here solely because of Petitioner's "*post hoc* assertions … about how he would have pleaded but for his attorney's deficiencies."  See Lee v. United States, 137 S.Ct. at 1967.  He has simply not shown "a reasonable probability that the end result of the criminal process would have been more favorable" absent Trotman's deficient advice.  See Frye, 566 U.S. at 147, 132 S.Ct. at 1409.  The Court, therefore, will deny and dismiss Petitioners motion to vacate.[7]

## IV.     CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

---

[6] Petitioner's demand that the jury determine forfeiture also evidences this desire. It has been the Court's experience that most defendants, even those who proceed to trial on substantive charges, waive their right to a jury determination on the forfeiture allegation and consent to judicial resolution at sentencing, should the case proceed that far.

[7] The Court has reviewed the other issues raised in Petitioner's motion to vacate – but not addressed at the evidentiary hearing – and finds them to be without merit. They too are denied and dismissed.

1.     Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [Doc. 1] is **DENIED**.

2.     **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

    **IT IS SO ORDERED**.

Signed: March 30, 2022

Robert J. Conrad, Jr.
United States District Judge